**UNITED STATES of America, Appellee,**

v.

**Charles ROGERS, Jr. Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Andrew J. BEAGAN, Defendant, Appellant.**

Nos. 95–1889, 96–2032.

United States Court of Appeals, First Circuit.

Heard July 29, 1997.

Decided Aug. 26, 1997.

Robert D. Watt, Providence, RI, with whom Frederick Q. Watt and Brian J. Sylvia, New Bedford, MA, were on brief, for appellant Charles Rogers, Jr.

Mark J. Gardner, for appellant Andrew J. Beagan.

Stephanie S. Browne, Assistant U.S. Attorney, with whom Sheldon Whitehouse, U.S. Attorney, was on brief, for appellee.

Before SELYA and LYNCH, Circuit Judges, and POLLAK, Senior District Judge.*

LYNCH, Circuit Judge.

A sting operation involving cocaine led to the arrests and convictions of Charles Rogers and Andrew Beagan. They, along with two others, were charged with conspiracy to distribute and to possess with intent to distribute over five kilograms of cocaine in violation of 21 U.S.C. § 846, and attempt to distribute and to possess with intent to distribute over five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). Rogers and Beagan both raise numerous challenges to their convictions. The most substantial of these is Rogers' sufficiency of the evidence claim. Beagan's claims revolve around his defense of entrapment. We affirm.

I.

During the Fall of 1994, members of the Providence Police Department met with Ronald Rego, an informer, to discuss a drug sting. Agreement was reached that Rego would receive 10% from a drug sting. In return, Rego would arrange a meeting between Detective Fred Rocha and Andrew Beagan, a codefendant here. Detective Rocha would arrange a cocaine sale to Beagan and arrest him at the time of the sale.

---

* Of the Eastern District of Pennsylvania, sitting by designation.

On November 16, 1994, Rego introduced Rocha to Beagan. The meeting was tape recorded. Rocha claimed he was a large-scale cocaine dealer and Beagan indicated he was interested in buying as much as 25 kilograms. Other telephone conversations and meetings took place in early December. Some of these were recorded. Rocha and Beagan agreed on a December 12 sale date.

Beagan and Rocha met on that day. Beagan told Rocha that "his people" did not want to carry all their money at once, so Beagan and Rocha agreed they would split the transaction into two parts. Rocha would first deliver 10 kilograms of cocaine and Beagan would pay. If Beagan's people liked the quality, then the remaining 15 kilograms would be exchanged.

Beagan and Rocha worked out the details of the exchange on the telephone. Rocha was to call Beagan later that day to tell him where to bring the "drop car" in which the cocaine was to be loaded. Rocha would then pick up the drop car, load it with 10 kilograms of cocaine and drive the car to an undisclosed location. Beagan would meet Rocha at a third location to show Rocha the money for the 10 kilograms. Once Rocha saw the money, he would tell Beagan where he had left the drop car. Beagan's people would pick up the drop car, and, if they were satisfied with the cocaine, Beagan would release the money to Rocha. If Beagan's people wanted to buy the remaining 15 kilograms, they would have to do so within the hour.

As planned, Beagan called Rocha to tell him that the drop car, a white Taurus, was in the University Heights parking lot in Providence. Rocha and another police officer picked up the car, which had been rented by David Scialo (the third codefendant in the case). The rental agreement listed Rogers as the second driver.

The police officers loaded into the car 25 kilograms of oatmeal packaged to look like cocaine. They moved the car to the parking lot of a ball field in Providence. Rocha called Beagan and told him to bring the money to the India Point Days Inn in Providence.

Beagan arrived at the motel parking lot around 4 p.m., accompanied by the final co-defendant in the case, Ruben DeLeon. DeLeon was carrying a black bag. Rocha saw that the bag contained bundles of money.

Beagan handed Rocha a cellular telephone (which belonged to Scialo) so that Rocha could tell Beagan's confederate at the other end of the line where the drugs were. However, the line went dead. Beagan plugged the telephone into an outlet in his car and the telephone soon rang. Beagan handed the phone to Rocha, who told the caller that the drop car was parked at the ball field parking lot at Power Street in Providence. Rocha then returned the telephone to Beagan, who remained on the line until he was arrested.

Officers who were stationed near the ball field saw a green Toyota pull up next to the drop car. Rogers was driving; Scialo and one other were passengers. The car was rented to Scialo. Scialo got out of the Toyota, into the drop car and began to drive away, following Rogers. Two officers saw that Rogers was holding a cellular phone to his ear. The authorities stopped the two cars and arrested Rogers and Scialo.[1]

Soon afterwards, FBI agents and Providence police arrested Beagan and DeLeon at the Days Inn. Telephone records established that around 4 p.m.(the approximate time that Rocha spoke to Beagan's confederate on the telephone and told him where to find the drop car), the telephone Rogers was holding was used to twice call the telephone Beagan was holding.

*Procedural History*

The four codefendants—Rogers, Beagan, Scialo and DeLeon—were charged and tried before a jury on the two drug trafficking counts. At the close of the government's case, Rogers moved for a judgment of acquittal as well as for a mistrial based on an allegedly improper statement by the prosecutor in his opening. The prosecutor had said that he would show that Rocha had spoken on the telephone to someone named Chuck during the drug deal. No such evidence was admitted at trial. The district court denied the motions, stating that defense counsel

---

1. They also arrested the other passenger in the car, Juan Toribio, but he later was released.

could argue in closing that the government had failed to produce promised evidence.

After beginning deliberations, the jury requested that the court instruct them once again on the meaning of predisposition. The court did so. Beagan objected to the instruction, asking that the jurors be told that in considering whether he was predisposed to commit the charged crimes, they might only consider his behavior prior to his contact with the government agents. The court declined to give the additional instruction. The jury returned to its deliberations, and Beagan, Rogers and DeLeon [2] were convicted on the two drug trafficking charges. Scialo was acquitted.

Beagan and Rogers moved for a new trial, each on different grounds. Rogers argued that the verdict was against the weight of the evidence and that there was newly discovered evidence, in the form of Scialo's testimony, which would exculpate Rogers. The district court ruled against him.

Beagan moved for a new trial on several grounds, only one of which warrants discussion: his claim of juror misconduct. Beagan filed an affidavit from Matthew Beagan, Jr., his brother, alleging that after the trial, Matthew Beagan had spoken to one of the jurors, who stated that the jury had been very confused about the meaning of the term "predisposition" and that some of the jurors had consulted dictionaries. The court called in the juror to whom Matthew Beagan had spoken, as well as one other juror, and questioned them regarding their post-trial contact with Matthew Beagan and the use of dictionaries by jurors. The questioning took place in the presence of counsel for all the parties in interest. After meticulous inquiry, the court denied Beagan's motion for a new trial. It found that although there had been juror misconduct in that at least one juror had consulted a dictionary on the term predisposition, the conduct was not prejudicial to Beagan because it occurred prior to the time the jurors requested additional legal instruction on the legal definition of the term.

Rogers was sentenced to 78 months' imprisonment. Beagan was subject to a statutory minimum of 240 months' imprisonment.

## II.

*Rogers*

Rogers' primary claim is that there was insufficient evidence to convict him on the two drug trafficking counts. He argues that he was merely present at the scene of the crime and that there is no evidence of his actual involvement.

The case against Rogers is admittedly circumstantial and requires some inferences. We review the facts in the light most favorable to the verdict. *United States v. Montas,* 41 F.3d 775, 778 (1st Cir.1994). Seen in this light, the evidence is sufficient to support Rogers' convictions on both counts.

It is true, as Rogers argues, that mere presence at the scene of a crime is insufficient to establish guilt. However, this court has distinguished between "mere" presence and "culpable" presence. A defendant's presence during the commission of a crime can establish guilt where the surrounding circumstances imply participation. *United States v. Montilla–Rivera,* 115 F.3d 1060, 1064 (1st Cir.1997); *United States v. Paulino,* 13 F.3d 20, 25 (1st Cir.1994); *United States v. Ortiz,* 966 F.2d 707, 711–12 (1st Cir.1992). Such is the case here.

It was Rogers who drove Scialo to the baseball field to pick up the drop car and who was listed as the second driver in the rental agreement. Most significantly, it was Rogers who was observed talking on a cellular phone in the middle of the drug deal. Records place his call to the cellular phone Beagan was using. Rogers was not merely present, he was talking on a cellular telephone with one of the conspirators while the deal was in progress. A jury could reasonably find that Rogers was discussing the cocaine sale, was a knowing participant in the drug conspiracy, *see United States v. Piper,* 35 F.3d 611, 615 (1st Cir.1994) (defining con-

---

**2.** DeLeon has petitioned for habeas relief, claiming that his attorney failed to file and perfect his appeal.

spiracy), and knowingly attempted to possess cocaine with the intent to distribute it, *see Paulino,* 13 F.3d at 25.[3]

■ Rogers' claim that he should be granted a new trial because his conviction was inconsistent with Scialo's acquittal also fails. Rogers' argument essentially is that there was more evidence of Scialo's involvement in the conspiracy than of his own, and that the jury's acquittal of Scialo shows that there was insufficient evidence to convict Rogers. To the extent that Rogers has preserved this claim, it is without merit.

■ A not guilty verdict against one co-conspirator is not the equivalent of a finding that the evidence was insufficient to sustain the conspiracy conviction of a second co-conspirator. *United States v. Bucuvalas,* 909 F.2d 593, 595–97 (1st Cir.1990). If the reviewing court finds the evidence was sufficient to support the verdict against the convicted defendant, the conviction must stand despite the co-conspirator's acquittal. *Id.* The evidence was sufficient.

■ Rogers also argues that the district court erred in denying his motion for a mistrial based on the prosecutor's opening statement. The prosecutor referred to someone identified as Chuck as being on the telephone receiving instructions from Rocha at the time of the drug deal (Rogers' given name is Charles). When the prosecutor attempted to elicit testimony from Rocha concerning that conversation, the court ruled the evidence inadmissible. Rogers argues that, given the importance of whether he spoke on the telephone with Rocha and Beagan during the drug deal, the court should have granted a mistrial. We disagree.

Rocha appropriately has not claimed the prosecutor's reference during his opening statement was made in bad faith to mislead the jury. In closing, defense counsel argued that there was no evidence linking Rogers to

the telephone call during the drug deal. And the district court charged the jury that statements by counsel argument are not evidence. The district court did not err in denying the motion for a mistrial. *See United States v. D'Alora,* 585 F.2d 16, 21 (1st Cir.1978) ("[A] defendant is not entitled to two trials, one before the judge to filter out inadmissible evidence and then a jury trial to determine guilt or innocence.")

■■ Nor did the court abuse its discretion in refusing to grant Rogers' motion for a severance. Such motions are only to be granted where the defendant makes out a strong showing of prejudice; a defendant is not entitled to severance merely because he may have a better chance of acquittal if tried separately. *Zafiro v. United States,* 506 U.S. 534, 540, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). A district court's decision to deny a motion for severance is accorded significant deference. *United States v. O'Bryant,* 998 F.2d 21, 25 (1st Cir.1993).

■ Rogers has not presented any reason why this case is different from most drug conspiracy cases with multiple defendants involved in the conspiracy to differing degrees, and co-conspirators generally are tried together. *United States v. Perkins,* 926 F.2d 1271, 1280 (1st Cir.1991). Contrary to Rogers' claim, his defense and Beagan's were not antagonistic, merely different. Beagan argued that he was entrapped, Rogers that he was merely present at the crime scene. These two theories of the case are not necessarily inconsistent. The district court scrupulously instructed the jurors that they must consider the evidence as to each charge and each defendant separately. The court did not abuse its discretion in refusing to sever.

### Beagan

■ Beagan's sole defense at trial and focus on appeal[4] was that he was entrapped.

---

3. Rogers' citation to *United States v. Thomas,* 114 F.3d 403 (3d Cir.1997), provides him no comfort. *Thomas* is distinguishable on its facts: unlike this case, it did not involve telephone calls between the defendant and a known conspirator while a drug deal was in progress.

4. Beagan's only unrelated argument is that a new trial is warranted because the district court never instructed the jury to ignore a drug rally outside the courthouse. This issue has been waived. Beagan's counsel requested that the court recess until the drug rally was over, and the court agreed. No request was made at the time for a specific curative instruction. Beagan

Beagan first argues that the district court's instruction on entrapment was legally incorrect. Specifically, he argues that the district court should have instructed the jury that the government was required to prove his predisposition to commit the charged crime based on evidence that predated his contact with the government. This is not a correct statement of the law. It is true that, when a defendant raises a defense of entrapment, the government must show that he was predisposed to commit the charged crime prior to his contact with government agents; however, the government may use the defendant's behavior after he was approached by government agents as evidence of his predisposition prior to meeting the agents. *See, e.g., United States v. Acosta,* 67 F.3d 334, 339 (1st Cir.1995).

 Beagan next argues that he is entitled to a new trial because jurors impermissibly used extrinsic material (a dictionary) to understand the meaning of the term "predisposition." Where, as here, a defendant makes a colorable claim of juror misconduct, the district court must determine whether any misconduct has occurred and if so, whether it was prejudicial. *United States v. Boylan,* 898 F.2d 230, 258 (1st Cir.1990). We review the district court's refusal to grant a new trial for abuse of discretion. *Id.* at 262; *see also United States v. Cheyenne,* 855 F.2d 566, 568 (8th Cir.1988) (giving "substantial weight to the trial court's appraisal of the prejudicial effects of extraneous information on the jury, since the trial judge has the advantages of close observation of the jurors and familiarity with the issues at trial").

 Here, Judge Boyle acted carefully and conscientiously in response to the allegations of juror misconduct. The court questioned the two jurors most closely involved. It determined that although at least one juror had referred to a dictionary to determine

the definition of predisposition, this occurred before the jury as a whole sought additional instruction on the legal definition from the court. The court concluded that whatever use was made of the dictionary, the jurors had been unsatisfied that they understood the legal import of the term predisposition and had properly turned to the court for further instruction. The court concluded that any misconduct had not been prejudicial because of the court's additional instruction on the legal meaning of predisposition.

There was no abuse of discretion. To the extent that the jurors' consulting the dictionary was misconduct,[5] we agree with the district court that any potential harm to the defendant was cured by the subsequent legal instructions on predisposition.

 Beagan's final claim is that he was denied effective assistance of counsel at trial. Trial counsel introduced evidence concerning Beagan's character, opening the door to evidence of Beagan's 1991 drug conviction and thereby, according to Beagan, totally undercutting the entrapment defense. In accordance with our usual practice, we will not consider a claim made for the first time on direct appeal. *See, e.g., United States v. Springer,* 28 F.3d 236, 239 (1st Cir.1994); *United States v. Mala,* 7 F.3d 1058, 1063 (1st Cir.1993). Determining whether assistance of counsel was constitutionally deficient is a fact-bound inquiry that would require us to go beyond the record on appeal and consider such matters as trial counsel's strategy. *See Springer,* 28 F.3d at 239; *Mala,* 7 F.3d at 1063.

*Affirmed.*

---

cannot now claim he is entitled to a new trial because he did not receive such an instruction. *United States v. Coady,* 809 F.2d 119, 123 (1st Cir.1987). Furthermore, the court repeatedly reminded the jury to refrain from considering anything heard outside the courtroom, which likely made a specific curative instruction unnecessary.

5. Courts that have considered the issue of juror dictionary use have not generally considered such use to be prejudicial per se. *See, e.g., United States v. Turner,* 936 F.2d 221, 226–27 (6th Cir.1991); *United States v. Cheyenne,* 855 F.2d 566, 567–68 (8th Cir.1988). This circuit has not yet passed on the issue of whether a juror's dictionary use even constitutes misconduct, and we have no need to do so here.