UNITED STATES, Appellee,

v.

Fidel A. MORILLO, Defendant, Appellant.

No. 97–2099.

United States Court of Appeals, First Circuit.

Heard June 1, 1998.

Decided Oct. 13, 1998.

Edgardo Rodríguez–Quilichini, Assistant Federal Public Defender, with whom Joseph C. Laws, Jr., Federal Public Defender, was on brief, for appellant.

Desirée Laborde–Sanfiorenzo, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, José A. QuilesEspinosa, Senior Litigation Counsel, and Camille Vélez–Rivé, Assistant United States Attorney, were on brief, for appellee.

* Of the Northern District of California, sitting by designation.

Before BOUDIN, Circuit Judge, SCHWARZER,* Senior District Judge, and SARIS,** District Judge.

SARIS, District Judge.

Appellant Fidel Morillo was arrested along with five others in connection with the seizure of three kilos of cocaine from drug couriers in the San Juan, Puerto Rico airport. At trial, the government contended that Morillo's role in the conspiracy was to allow his alleged co-conspirators to use his apartment as the operational center of the drug conspiracy. A jury convicted Morillo of conspiracy in violation of 21 U.S.C. § 846 but found him not guilty of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2. His sole argument on appeal is that the evidence against him was insufficient to support a conviction and that, therefore, the trial judge should have allowed his motion for acquittal. After a careful review of the record, we now reverse, although we agree with the trial judge that this is a close case.

## I. FACTUAL BACKGROUND

We summarize the relevant facts, "interpreting the record in the light most helpful to the government." *United States v. Ortiz,* 966 F.2d 707, 710 (1st Cir.1992).

In April 1996, Fidel Morillo leased an apartment located at HY–1, 252 Street, in the "Country Club" neighborhood of Carolina, Puerto Rico ("HY–1"). It is near the San Juan airport. Morillo had been experiencing marital difficulties and moved into HY–1 with his mistress, Felicia Santos. At the inception of the lease, Morillo was given the only key to the apartment. The small apartment, furnished by Morillo, had a living room, a kitchen and a bedroom, which was separated from the living room by a door. Morillo, who worked as an installer at a water heater supply company, stopped spending the night at the apartment in mid-August 1996, when he moved back to his wife's house. However, he made rent payments on HY–1 through October 1996.[1] San-

** Of the District of Massachusetts, sitting by designation.

1. Actually, his wife, through counsel, made the

tos continued to live in the apartment until early to mid-September 1996, when she went to New York for about fifteen days. During that period, landlord Ysidro Fernández,[2] who lived in an attached house, only saw Morillo's truck at the apartment once or twice. Santos returned briefly on October 2, only long enough to tell the landlord that she was leaving permanently to return to her native Santo Domingo, Dominican Republic.

Also on October 2, co-conspirators Fiordaliza Durán and Rosa Peguero flew from John F. Kennedy Airport in New York to San Juan for the purpose of transporting cocaine from Puerto Rico back to New York. Two brothers, co-conspirators Eddison and Hanzel Núñez, picked the women up at the San Juan airport early that evening and brought them to HY–1. Hanzel Núñez let the women into the apartment with a key. No one was in the apartment when Durán and Peguero were dropped off there, without their luggage, and they slept together in the single unoccupied bedroom.

At approximately 9:00 or 9:30 the next morning, October 3, Morillo knocked on the apartment door of HY–1. Peguero, who had met Morillo in September 1996 when she previously stayed in the apartment,[3] opened the door and let Morillo in. Morillo changed into some clothes that were kept in the bedroom closet. Durán, who had never met Morillo, was wearing a man's shirt that she had obtained from the bedroom closet, and she told him she did not know "to whom it belongs." Morillo told Durán it was his shirt but that she could keep it because it did not fit him anymore. Morillo used the telephone

in the living room briefly and then, at Peguero's request, took her to a nearby bodega for cigarettes in a large red van. After taking Peguero back to HY–1, Morillo left the apartment. There is no evidence that there were drugs or paraphernalia in plain view anywhere in the apartment during Morillo's October 3 visit. Also, there is no evidence that Morillo spoke with Peguero or Durán, both of whom testified at trial, about the purpose of their sojourn.

Morillo did not return to HY–1 or have any other contact with the two women or the Núñez brothers on October 3. The brothers stopped by HY–1 after Morillo's visit and were in and out throughout the day along with an unidentified man. At some point, they brought to HY–1 another woman, co-conspirator Altagracia Domínguez, who was a cousin of Morillo's mistress, Santos. Like Peguero, Domínguez had been at the apartment during her September visit to Puerto Rico. During the day, the Núñez brothers assisted the couriers with arrangements to return to New York, including visits to several travel agents. The brothers took the women to a shopping mall and met them later that evening for dinner. Morillo did not participate in any of these activities. Domínguez slept in HY–1 with Durán and Peguero on the night of October 3. The men slept elsewhere.

Between 9:00 and 10:00 a.m. on October 4, the Núñez brothers and the other man returned to HY–1 with luggage and a black bag containing the drugs. The three men went into the bedroom, took out three kilogram bags of cocaine, and prepared them for

---

last monthly rental payment while Morillo was in jail.

2. The landlord is referred to in the trial transcripts as both "Hernández" and "Fernández." The Court adopts the name used by the parties, Ysidro Fernández.

3. This earlier trip bears noting. On day 2 of the trial, another defendant introduced into evidence, without objection by Morillo, a DEA report concerning the interview of Peguero by DEA Agent Iván Ríos. According to the report, Peguero told the agent that in September she and another female co-defendant, Altagracia Domínguez, had traveled to Puerto Rico, where they were picked up by the Núñez brothers and driv-

en to Morillo's apartment. The purpose of this earlier trip from New York City was also to transport cocaine from Puerto Rico. During this trip, Santos had introduced Domínguez to the landlord as her cousin. This is also when Peguero first met Morillo. Later, the trial judge precluded the government from eliciting testimony concerning the purpose of the earlier trip because the government conceded it had failed to give defendants notice that it intended to introduce evidence concerning prior bad acts pursuant to Fed.R.Crim.P. 404(b). This issue was not raised on appeal. We do not consider this earlier drug trafficking trip in the sufficiency-of-the-evidence calculus concerning Morillo's knowledge of the purpose of the October 2–4 trip.

transportation to New York with transparent paper, tape and Vaseline. At least one of the men and Domínguez secured the packages of cocaine to the thighs of Durán and Peguero. Domínguez was scheduled to return to New York with more drugs later that afternoon. The drug paraphernalia, cellophane wraps, tape and a calling card covered with white powder residue were scattered in plain view throughout the bedroom on the bed and the bureau as the women prepared to leave the apartment.

At about 10:00 or 10:30 a.m. on October 4, Morillo went to the house physically attached to HY–1 to see Fernández, the landlord and Morillo's trusted co-worker and friend. Morillo asked Fernández if he could borrow Fernández' car, a late-model green Hyundai, to go to their workplace because his vehicle was in the shop. Morillo left the building in the Hyundai for approximately half an hour and returned the car at about 11:00 a.m. While he was gone, Fernández walked through an unlocked door into the living room of HY–1, as was his custom, to get something from the refrigerator. He saw one "fat" man, whom he did not recognize, sleeping on the living room couch. When Morillo returned in the Hyundai, he gave the car keys back to Fernández.

Sometime around 11:00 a.m., after the drugs were attached to the couriers and just as Eddison Núñez was preparing to take the two women to the airport, Morillo stopped by HY–1 itself for the first time since his brief visit the previous day. As Morillo walked into the living room, he said in Spanish, "Oh, las muchachas se van ya?" or "Are the girls leaving now?" Immediately thereafter, Eddison Núñez, Durán and Peguero left the apartment in a green Mitsubishi Mirage. When they left for the airport, the door to the bedroom was open. Morillo remained in the apartment with Hanzel Núñez, Domínguez and the other man. He was not present when the drugs were prepared, packaged, and put on the "mules." Only five to eight minutes after he had returned with the Hyundai, Morillo went back to the attached house to ask Fernández for a ride in the Hyundai to pick up Morillo's red pickup truck at the shop, where he and his wife had

left it earlier that day. Fernández said he could not go with Morillo, but he let him re-borrow the Hyundai. Meanwhile, at approximately 11:10 a.m., federal agents began following the Mitsubishi a short distance from the apartment at another house, where Eddison Núñez had stopped to pick up a plane ticket. They went directly to the San Juan airport from the house. At approximately 11:20 a.m., Durán and Peguero got out of the car at the airport, and Eddison Núñez drove away. Durán and Peguero were stopped and then questioned, searched and arrested in the airport's DEA office. A total of three kilos of cocaine was seized from the two women, along with two plane tickets from San Juan to Kennedy Airport. Agents followed the Mitsubishi after it left the airport, but they stopped following it or lost the car between noon and 12:20 p.m.

At around 12:30 p.m., agents spotted the Mitsubishi near the point where they had lost contact with it. The car was stopped in front of a travel agency about 1000 meters from HY–1, and the agents saw Domínguez get into the car. They stopped the Mitsubishi after it drove away and placed Hanzel Núñez and Domínguez, the only occupants of the car, under arrest. During the stop and arrest, agents recognized Eddison Núñez riding by the scene in the passenger seat of Fernández' Hyundai. The agents put on their car's siren and signaled the Hyundai to pull over. Then Eddison Núñez looked behind him and, seeing the police officer in the middle of the street aiming a pistol at the Hyundai from a range of ten feet, motioned to the car's driver, Morillo, to continue driving. Morillo slowed the car but drove approximately fifty meters before he stopped. Both Morillo and Eddison Núñez were arrested on the scene.

Tracing the Hyundai back to HY–1, the police arrived at the apartment around 3:00 p.m. and found both the front and back doors open. They searched Fernández' house with his consent and, pursuant to a search warrant, searched the apartment on the evening of October 4 after 10:00 p.m. They seized Morillo's work beeper and his personal telephone book from the living room. There were also two phone bills, one under Santos'

name dated August 22, 1996. The police seized some transparent paper, tape and a jar of Vaseline (in a Walgreen's bag), which were all still in plain view on the bed and bureau in the bedroom. They also seized a phone card, dusted with white residue, from the top of a bureau, which was also sprinkled with that powder, and an electronic scale from the bedroom closet. Finally, police found two more kilos of cocaine, together with more drug paraphernalia, under the bed in the bedroom, wrapped in a woman's robe or nightgown. Domínguez' bag and clothes were still in the bedroom. The package of two kilos of cocaine could not be seen without lifting two mattresses and disrobing them. The door to the bedroom was closed at the time the police entered. The bedroom was in the same condition at the time of the search as it was when Peguero and Durán left for the airport. A videotape of the appearance of the apartment at the time of the search was introduced into evidence and played for the jury.

Morillo, the Núñez brothers, Domínguez, Durán and Peguero were indicted on one count of conspiracy to distribute cocaine and one count of possession of cocaine with intent to distribute. Durán and Peguero, pursuant to plea agreements, testified at the joint trial of Morillo and the Núñez brothers in January 1997. The Núñez brothers were found guilty on both counts of the indictment. The jury found Morillo guilty on Count I (conspiracy) and not guilty on Count II (possession with intent to distribute). Although pronouncing it a close call, the trial judge denied Morillo's motion for acquittal at the end of the government's case and again after all the evidence was presented. Morillo was sentenced to 78 months in prison on August 1, 1997. This appeal followed.

## II. *SUFFICIENCY OF THE EVIDENCE*

Morillo asserts that the trial judge erred in denying his motion for acquittal because there was insufficient evidence for a jury to convict him of conspiracy to distribute cocaine with the Núñez brothers, Peguero, Durán and Domínguez.

■ Our review on this single appeal issue is familiar, often recited, and limited:

The challenges to the sufficiency of the evidence and to the denial of the motion for judgment[ ] of acquittal raise a single issue. We assess the sufficiency of the evidence as a whole, including all reasonable inferences, in the light most favorable to the verdict, with a view to whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. We do not weigh witness credibility, but resolve all credibility issues in favor of the verdict. The evidence may be entirely circumstantial, and need not exclude every reasonable hypothesis of innocence; that is, the factfinder may decide among reasonable interpretations of the evidence.

*United States v. Garcia,* 983 F.2d 1160, 1164 (1st Cir.1993) (quoting *United States v. Batista–Polanco,* 927 F.2d 14, 17 (1st Cir.1991) (citations omitted)); *see also United States v. Berrios,* 132 F.3d 834, 841 (1st Cir.1998). In making their decision, jurors "may draw reasonable inferences from the evidence based on shared perceptions and understandings of the habits, practices, and inclinations of human beings." *United States v. Ortiz,* 966 F.2d 707, 712 (1st Cir.1992). Therefore, when assessing a sufficiency challenge, we require jurors neither "to divorce themselves from their common sense nor to abandon the dictates of mature experience." *Id.*

■ However, in applying their common sense, the jurors cannot convict unless the evidence is sufficient to find guilt beyond a reasonable doubt. *See United States v. Valerio,* 48 F.3d 58, 64 (1st Cir.1995). If the evidence " 'viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged,' this court must reverse the conviction. This is so because ... where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, 'a reasonable jury *must necessarily entertain* a reasonable doubt.' " *United States v. Flores–Rivera,* 56 F.3d 319, 323 (1st Cir.1995) (omission in original) (quoting *United States v. Sanchez,* 961 F.2d 1169, 1173 (5th Cir.1992)). We must conduct a

close review of the record and "reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir.1995).

The only crime at issue in this appeal is conspiracy to distribute narcotics. 21 U.S.C. § 846. "To prove the elements of the crime of conspiracy, the government must show the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy." *United States v. Gomez–Pabon*, 911 F.2d 847, 852 (1st Cir.1990). Though the government need not prove an overt act in order to establish a violation of 21 U.S.C. § 846, the fact that a defendant "knew what was going on" is, on its own, "not enough to establish intent to conspire." *United States v. O'Campo*, 973 F.2d 1015, 1020 (1st Cir.1992) (quoting *United States v. Ocampo*, 964 F.2d 80, 82 (1st Cir.1992)). To prove that the defendant belonged to and voluntarily participated in the conspiracy, the government must prove two kinds of intent: "intent to agree and intent to commit the substantive offense." *Gomez–Pabon*, 911 F.2d at 853 (quoting *United States v. Rivera–Santiago*, 872 F.2d 1073, 1079 (1st Cir. 1989)). Due to the clandestine nature of criminal conspiracies, "[t]he agreement itself 'need not be express, but may consist of no more than a tacit understanding.'" *United States v. Echeverri*, 982 F.2d 675, 679 (1st Cir.1993) (quoting *United States v. Glover*, 814 F.2d 15, 16 (1st Cir.1987)).

The government contends that Morillo participated in the drug trafficking conspiracy by knowingly permitting his apartment to be used as the operational center for housing the "mules" and for storing and packaging the cocaine. When a defendant has knowledge of a drug trafficking conspiracy, willfully allowing others to use a dwelling for the drug distribution activity is sufficient to support a conspiracy conviction. *See Rivera–Santiago*, 872 F.2d at 1080–81 (affirming a conspiracy conviction where there was direct evidence that the owner of a house agreed to allow a truckload of marijuana to be stored there); *cf. United States v. Luciano–Mosquera*, 63 F.3d 1142, 1150 (1st Cir.

1995) (providing a house for a meeting at which guns were displayed and discussed and at which defendant was present supported liability for substantive crime under an aiding and abetting theory).

A close review of the trial record reveals that no direct evidence was submitted to the jury showing that Morillo agreed that the Núñez brothers and the three women could use his apartment as a base for the drug shipment. The jury heard evidence that Morillo had met Peguero and Domínguez previously in HY–1 in September. They also heard, however, that Domínguez was the cousin of Morillo's former mistress, Santos, and that Santos was still living in HY–1 when Peguero and Domínguez made their September visit to Puerto Rico. The government emphasizes Hanzel Núñez' possession of the apartment key as evidence that Morillo lent his apartment to the conspirators. Whether Hanzel obtained the key from Morillo or from the recently departed Santos, Morillo's comfort level with and hospitality to the others at HY–1 support the reasonable inference that Morillo had authorized them to use the apartment, at least with respect to October 3 and 4. But the reasonable inferences regarding the scope of Morillo's agreement to lend stop there. The jury heard no evidence of any involvement of Morillo in any other aspect of the conspiracy, such as planning the shipment with the Núñez brothers, handling drugs or buying plane tickets. Although the jury could reasonably infer that Morillo authorized the use of the apartment, there is insufficient evidence connecting that authorization to the purpose of possessing and distributing cocaine. *See United States v. Andujar*, 49 F.3d 16, 21–22 (1st Cir.1995) (reversing the conspiracy conviction of a defendant who made his office and warehouse available to conspirators and even arranged meetings between them where there was no proof that he "was aware that the meetings concerned a pending drug deal" before the fact).

Absent evidence of a prior agreement to lend the apartment to the others in furtherance of the drug conspiracy, the path to a supportable conviction necessarily begins with the question of when, if ever, Morillo

gained knowledge of the conspiracy based at the apartment. Many of our cases in which we have allowed an inference of knowledge have involved defendants who have actually lived in the subject apartment during the course of the conspiracy; in each of these cases, the jury's conclusion that the defendant knew about the distribution scheme followed almost inexorably from his or her knowledge of large amounts of drugs or distribution paraphernalia. *See, e.g., Echeverri,* 982 F.2d at 679 (affirming the conviction of a "sole tenant" of a "tiny apartment" in which drugs, a scale and a ledger were found within feet of the tenant); *United States v. Vargas,* 945 F.2d 426, 429–30 (1st Cir.1991) (affirming the distribution conspiracy conviction of a tenant who was the "only tenant and occupant" of an apartment to which occupant had exclusive access and in which drugs were found and drug records were in open view); *United States v. Tabares,* 951 F.2d 405, 409 (1st Cir.1991) (affirming the conspiracy convictions of defendants who paid the rent and lived in the apartment where drugs and paraphernalia were found and which was leased in one defendant's name). Importantly, the issue in determining knowledge is not whether the drugs or paraphernalia were "accessible" to the defendant when he was in the apartment, but rather whether the defendant knew of the drugs' existence. *See Valerio,* 48 F.3d at 64 & n. 4 (reversing the conspiracy conviction of the short-term occupant of an apartment in which a large cache of drugs was stored out of plain view).

Here, the evidence of what Morillo saw in the apartment is insufficient to support an inference of knowledge of the purpose of the conspiracy on October 2 or 3. Morillo had not actually lived in the apartment for six weeks. The first time he visited the apartment during the course of the conspiracy was early in the day on October 3. Peguero and Durán were there, without luggage. The three kilos destined for their thighs had not yet been brought to the apartment. Even if the two kilos in the robe were under the bed at that time—and there is no evidence they were—those drugs were not in plain view. Knowledge of that package cannot be imputed to Morillo. Morillo went into the bedroom closet on October 3, where the scale was later found, but, again, there is no evidence of when the scale was put there. Morillo's casualness with the women's presence, his offering his shirt to Durán, and his taking Peguero for cigarettes, although suspicious, are insufficient to support an inference of knowledge on October 3 of a conspiracy to transport three kilos of cocaine to New York. Morillo did not come by HY–1 again for at least 26 hours.

The evidence concerning October 4 paints a different picture. Morillo arrived at the apartment as early as 11:00 a.m., just as Eddison Núñez and the couriers were departing for the airport. The jury could have reasonably concluded that Morillo knew that the apartment was being used for drug distribution at that point because the bedroom door was wide open at the time the "muchachas" hurried out to the airport. The apartment was tiny, and Morillo had belongings in the bedroom. The bedroom was littered with drug packaging paraphernalia and cocaine residue, of which even he, for this purpose a short-term visitor, could be deemed to have knowledge. An inference that he knew about the two kilos still stored under the bed, however, remains unsupportable by the evidence.

The government argues that Morillo's presence at the apartment during such a "critical juncture" of the conspiracy allowed the jury to infer prior knowledge of the conspiracy's purpose. *United States v. Mangual–Corchado,* 139 F.3d 34, 47–48 (1st Cir. 1998); *United States v. Lema,* 909 F.2d 561, 570–71 (1st Cir.1990). Because it "runs counter to human experience to suppose that criminal conspirators would welcome innocent nonparticipants as witnesses to their crimes," we have accepted that juries may infer a defendant's culpable involvement from the fact that other conspirators continued their criminal activity despite the defendant's arrival in a den of iniquity. *Batista–Polanco,* 927 F.2d at 18 (rejecting the hypothesis that participants in a distribution scheme "would permit a noncontributing interloper" to remain for 45 minutes in a small apartment "conspicuously strewn with evidence of a large scale heroin packaging operation ... while their conspicuous criminal

conduct continued unabated"); *see also Ortiz,* 966 F.2d at 712 (observing that criminals "rarely seek to perpetrate felonies before larger-than-necessary audiences"). The government's position is essentially that Morillo's presence during the criminal activity on October 4 allowed the jury to draw an inference of knowing participation prior to his arrival that day.

█ Morillo counters that the jury could not make such an inference of prior knowledge from his mere presence on October 4. "Mere presence at the scene of the crime" or "mere association with conspirators," *Gomez–Pabon,* 911 F.2d at 853, is not automatically sufficient to establish guilt. *Compare Andujar,* 49 F.3d at 21–22 (reversing conviction because, despite the defendant's presence nearby, the government failed to prove that the defendant knew that conspirators were using his office, which the defendant had lent them, for a drug conspiracy) *with Ocampo,* 964 F.2d at 82–83 (holding that evidence that the defendant was living for four to six months with her trafficking boyfriend in a small apartment where a beeper, drug paraphernalia and drugs were kept was insufficient to establish her intent to conspire even though there was a fair inference that she knew what was going on). The ultimate question is always whether the circumstances of the particular case add up to showing both knowledge *and* voluntary participation in a conspiracy beyond a reasonable doubt. *See United States v. Rogers,* 121 F.3d 12, 15 (1st Cir.1997) (describing the distinction between "mere" presence and "culpable" presence). In this case, if Morillo's knowledge had been early enough, the evidence would be sufficient to support a conspiracy conviction because it would support a reasonable inference that the defendant had made his apartment available with the intent to facilitate the crime.

In our opinion, the evidence presented by the government of the behavior of Morillo and the others is insufficient for a reasonable factfinder to conclude beyond a reasonable doubt that Morillo knew about the conspiracy before 11:00 a.m. on October 4, 1996, when it was substantially completed so far as the use of Morillo's apartment was concerned. Morillo's spontaneous statement that "The girls are leaving now" is innocent on its face and does not support an inference of prior knowledge of the drug conspiracy. The conspirators' insouciance about leaving the bedroom door open with drug paraphernalia conspicuously strewn about does suggest either that the others knew that Morillo knew the purpose of the trip or trusted him sufficiently not to clean up. However, unlike in cases adhering to the common sense adage that criminals rarely welcome innocent persons as witnesses to serious crimes, Morillo was not present during the packaging of the drugs or the preparation of the couriers.

Also, though Morillo was the "sole rent payer," his situation does not fall neatly into the line of those cases that reject sufficiency challenges by occupants with "the exclusive right to control the comings and goings" in an apartment because Morillo, although the lessee, no longer resided in the apartment and was rarely there. *Echeverri,* 982 F.2d at 678 & n. 2 (holding evidence of conspiracy was sufficient where the defendant was "hardly powerless to determine who and what could come inside"). Further, his erstwhile mistress Santos, who was a cousin of one conspirator and knew at least one other, had been living there after Morillo moved out in mid-August and had left the country the very day the conspiracy commenced. Any inference imputing knowledge of the distribution conspiracy prior to his visit to the apartment on October 4 is overly speculative and not supportable by the evidence and, therefore, must be rejected. *See Andujar,* 49 F.3d at 22 ("[A]fter-the-fact knowledge of an illegal conspiracy and presence at the operative location are relevant factors for the jury to consider. Nevertheless, these factors alone are insufficient to establish a conspiracy conviction.").

Finally, the evidence of voluntary participation by Morillo *after* he gained knowledge is insufficient to support a guilty verdict beyond a reasonable doubt. Morillo was arrested while driving Hernández' Hyundai with Eddison Núñez in the passenger seat after federal agents broke off their observation of the Mitsubishi that Eddison Núñez had used to take Durán and Peguero to the

airport. The evidence, taken in the light most favorable to the government, indicates that Morillo slowed but did not stop and, at Eddison Núñez' urging, drove the car approximately 50 meters after being signaled to stop by the police, who were in the process of arresting Hanzel Núñez and Domínguez in the Mitsubishi on the side of the road. Although the jury was entitled to treat this sluggish flight as evidence of consciousness of guilt, *see United States v. Lopez*, 944 F.2d 33, 40 (1st Cir.1991), the fact that Morillo was giving Eddison Núñez a ride, without any evidence of conspiratorial purpose, falls short of voluntary participation in a serious criminal conspiracy. Even if Morillo knew of the conspiracy when he was arrested, the government cannot escape its burden to prove Morillo's intent to agree and to commit the substantive offense at a time that he had such knowledge. Lending one's apartment to others for use as a safe house for a drug shipment supports a conspiracy conviction. Nonetheless, the facts of this case, in which the evidence presented by the government did not support a fair inference of knowledge beyond a reasonable doubt until the apartment's use was all but completed, are insufficient to sustain Morillo's conviction.

For these reasons, Morillo's conviction is *REVERSED*.