USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

 

No. 98-2172

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 RUBEN I. DELEON,

 Defendant, Appellant.

 ON APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Francis J. Boyle, U.S. District Judge]
 [Hon. Ernest C. Torres, U.S. District Judge]

 Before

 Torruella, Chief Judge,
 
 Noonan, Senior Circuit Judge,*
 
 Lynch, Circuit Judge.
 
 
 
 
 Stephanie S. Browne, Assistant U.S. Attorney, with whom
Margaret E. Curran, U.S. Attorney, was on brief, for government.
 Angel Taveras, with whom Brown, Rudnick, Freed & Gesmer, was
on brief, for appellant.

July 19, 1999

 
 
*Of the Ninth Circuit, sitting by designation.

 LYNCH, Circuit Judge. After a successful sting
operation, the government charged Ruben I. DeLeon with conspiracy
to possess and distribute cocaine, in violation of 21 U.S.C. 846,
and the attempt to possess with intent to distribute cocaine, in
violation of 18 U.S.C. 841(a)(1). DeLeon and his three co-
conspirators were tried together. The jury convicted DeLeon and
two of his co-defendants, but acquitted co-defendant David Scialo
of all charges. DeLeon now appeals his conviction and challenges
his sentence. We affirm.
 I
 In the fall of 1994, Rhode Island police detective Fred
Rocha met with Andrew Beagan, later DeLeon's co-defendant, to
arrange a large cocaine sales transaction. They agreed that Rocha,
who was supplying the cocaine, would pick up a "drop car," load it
with ten kilograms of cocaine, drive it to an undisclosed location,
and then meet Beagan at a separate location to collect the payment. 
Detective Rocha delivered the car and contraband as planned and
then went to a Days Inn Hotel parking lot where he waited for
Beagan. Beagan arrived with DeLeon, who was carrying the money for
the buy. DeLeon brought the money to Detective Rocha and observed
Rocha as he inspected the money, which was bundled in packages of
$5,000. As Detective Rocha examined the money, he conversed with
DeLeon and, unbeknownst to DeLeon, recorded their conversation. 
Meanwhile, co-defendants Charles Rogers and David Scialo were
retrieving the drop car and the cocaine. All of the defendants
were soon arrested, indicted, and tried together.
 II
 DeLeon has raised three objections to his conviction, and
one to his resentencing. First, he says that the district court
abused its discretion by refusing to sever his trial from those of
his co-defendants, particularly Beagan, and that this error had a
significant prejudicial effect on him. Second, he argues that the
court abused its discretion in allowing the jury to use an
unauthenticated transcript and translation of his recorded
conversation with Detective Rocha in the Days Inn parking lot. 
Third, he contends that the court abused its discretion by allowing
the government to conduct ex parte in camera interviews with two
jurors, nineteen months after his conviction, in order to further
investigate allegations of jury tampering as to co-defendant
Scialo. Finally, DeLeon says that at resentencing the court
incorrectly believed that it lacked the authority to depart
downward (from the guideline sentencing range) on the basis of
DeLeon's status as a deportable alien, and so this court should
vacate his sentence and remand for resentencing.
A. Denial of Severance Motions
 DeLeon argues that the district court abused its
discretion by refusing to sever his trial from those of his co-
defendants in light of the following three combined factors: first,
defense counsel's repeated inquiries, on direct examination, into
third-party "generalized fear" of Beagan's potential for violence;
second, the government's six references to Beagan's prior
conviction for possession of cocaine with intent to deliver --
evidence admitted in response to character evidence introduced on
Beagan's behalf; and third, the potential "spillover" prejudice to
DeLeon due to the significant disparity in both the nature and the
amount of evidence introduced against Beagan in comparison to that
introduced against DeLeon. DeLeon moved to sever his trial on
several occasions; each time, his request was denied. We review
the district court's denials of severance motions for manifest
abuse of discretion. See United States v. Boylan, 898 F.2d 230,
246 (1st Cir. 1990). We note that this court has already rejected
a similar claim made by co-defendant Charles Rogers. See United
States v. Rogers, 121 F.3d 12, 16 (1st Cir. 1997).
 DeLeon's argument is that because his role in the drug
transaction was so minor, the jury should not have been asked to
assess his case alongside Beagan's case for fear that some
spillover prejudice might taint DeLeon's verdict. See Fed. R.
Crim. P. 14 (stating that if a defendant is prejudiced by a joinder
for trial, then the court may order separate trials). "The
difficulty with this argument lies in the case law holding to the
contrary." United States v. Rawwad, 807 F.2d 294, 295 (1st Cir.
1986). This court's rule is that those "who are indicted together
should be tried together," United States v. O'Bryant, 998 F.2d 21,
25 (1st Cir. 1993), and the district court's joinder in this case
appropriately followed that presumption. See United States v.
Perkins, 926 F.2d 1271, 1280 (1st Cir. 1991) (noting the "obvious"
reasons to try jointly those persons charged as co-conspirators in
the identical cocaine sale, and citing Fed. R. Crim. P. 8(b)). 
DeLeon has not challenged this initial decision by the district
court.
 To overcome the district court's presumption in favor of
joinder, DeLeon must demonstrate prejudice so pervasive that it
would be likely to effect a miscarriage of justice. See United
States v. Pierro, 32 F.3d 611, 615 (1st Cir. 1994); United States
v. Sabatino, 943 F.2d 94, 96-97 (1st Cir. 1991). This requirement
means more than establishing that the defendant might have had a
better chance of acquittal in a separate trial. See Zafiro v.
United States, 506 U.S. 534, 540 (1993). "This is a difficult
battle for a defendant to win," Boylan, 898 F.2d at 246, and the
circumstances of this case do not equip DeLeon to meet the
challenge.
 DeLeon's best effort is his argument that he was severely
prejudiced when Beagan's counsel repeatedly inquired about
generalized third-party fear of Beagan's potential violence. The
trial judge, after denying the severance motions filed by all the
co-defendants in response to Beagan's testimony, acknowledged that
he was "getting close to the point where [he was] seriously
considering [granting the motions]." The judge conceded that
"these [references to third-party fear] are beginning to add up,"
and warned that "if it [didn't] stop," then he would grant the
severance motions. DeLeon contends that if, at that point, the
court was already wavering, then the government's six subsequent
references to Beagan's prior conviction -- and the additional
potential prejudice they carried -- should have driven the court to
grant the severance motions.
 At bottom, this is simply a disagreement with the
district court's exercise of its considerable discretion. See
Boylan, 898 F.2d at 246 (stating that the decision whether to grant
or deny a severance motion is committed to the district court's
discretion). Significant deference is given to a district court's
decision to deny a severance motion. See Rogers, 121 F.3d at 16. 
That the decision was apparently a close one for the district court
does not divest the district court of its discretion or permit this
court to examine more closely the exercise of that discretion. 
See O'Bryant, 998 F.2d at 25-26 ("[T]he district court is best able
to gauge matters of joinder and severance because its first-hand
exposure to a case gives it a unique ability to evaluate
conflicting arguments, . . . consider all the ramifications
attendant to a defense motion, and strike the delicate balance
between fending off prejudice, on the one hand, and husbanding
judicial resources, on the other hand.").
 Our case law supports the court's decision in this case. 
There is, of course, the ever-present risk of prejudice in such
joint trials. Cf. Zafiro, 506 U.S. at 539 (explaining that "[w]hen
many defendants are tried together in a complex case and they have
markedly different degrees of culpability, this risk of prejudice
is heightened") (emphasis added). DeLeon has emphasized this
potential for prejudice in his case, but "ha[s] failed to show
anything greater." United States v. Cresta, 825 F.2d 538, 555 (1st
Cir. 1987); see also Boylan, 898 F.2d at 246 ("Even where large
amounts of testimony are irrelevant to one defendant, or where one
defendant's involvement in an overall agreement is far less than
the involvement of others, we have been reluctant to secondguess
severance denials.").
 Furthermore, the district court took appropriate measures
to safeguard against potential spillover prejudice by instructing
the jury to consider separately the charges and the evidence as to
each defendant. See Rogers, 121 F.3d at 16 (acknowledging the
district court's instruction that the jury should consider
separately the evidence and charges against each defendant);
Boylan, 898 F.2d at 246 (approving the district court's use of
"appropriate limiting instructions" as to evidence against
particular defendants); Cresta, 825 F.2d at 555 (same).
 Co-defendant Scialo's acquittal on all charges suggests
that the jury was capable of following the trial judge's
instructions and did so. See Pierro, 32 F.3d at 616 ("Here, there
is no basis to suppose that the jurors disregarded the trial
judge's admonitions and departed on a frolic of their own."); see
also Cresta, 825 F.2d at 555; Boylan, 898 F.2d at 246; United
States v. Tashjian, 660 F.2d 829, 834 (1st Cir. 1981).
B. Use of Unauthenticated Transcript and Translation
 During Detective Rocha's testimony at trial, the
government asked him to relate his conversation with DeLeon in the
Days Inn parking lot. The government also introduced a tape
recording of their conversation. To help the jury follow the
conversation, which was conducted in both Spanish and English, the
government provided an unauthenticated transcript and translation. 
The district court gave the transcript to the jury as an aid and
properly instructed the jury that the recording, not the
transcript, was the evidence. See United States v. Ademaj, 170
F.3d 58, 65 (1st Cir. 1999). The court did not admit the
transcript into evidence. At that time, DeLeon did not challenge
the accuracy of the transcript or object to its use as a jury aid.
 During its deliberations, the jury asked the court for a
translation of the Spanish portions of the tape-recorded
conversation. The trial judge, with the agreement of all counsel,
denied this request. The jury then sought permission to listen to
the tape recording for a second time, and the court granted its
request. During this playback of the tape recording, the court
gave the government's transcript to the jury for use as an aid and
repeated its earlier instruction that the recording, not the
transcript, constituted the evidence in this case. At this point,
DeLeon raised his first objection to the use of the transcript as
a jury aid during the jury's deliberations, albeit in the courtroom
and while listening to the tape recording. (Because the transcript
was not in evidence, the court never sent it into the jury room.) 
His objection was overruled. Reiterating his challenge on appeal,
DeLeon admits that he should have raised this objection at the
first use of the transcript at trial and acknowledges that this
failure elevates his legal hurdle here to plain error review. 
See United States v. Martinez, 83 F.3d 371, 376 n.5 (11th Cir.
1996) (finding that defendant's objection to testimony as
excludable hearsay was untimely because it came after the defense
had rested, and reviewing trial court's decision for plain error);
cf. United States v. Tse, 135 F.3d 200, 209 (1st Cir. 1997)
(stating that failure to object when a conversation was introduced
into evidence did not preserve issue for appeal even though the
defendant objected at the close of the evidence to a transcript of
the conversation being given to the jury, and reviewing the
admission of the statements for plain error). DeLeon asserts that
he has met the "plain error" standard. He has not.
 To warrant a reversal of his conviction, DeLeon "must
show: (1) the occurrence of an error; (2) that the error is obvious
or clear under current law; and (3) that the error substantially
and adversely affect[ed] [his] rights . . . ." United States v.
Roberts, 119 F.3d 1006, 1014 (1st Cir. 1997) (citing United States
v. Olano, 507 U.S. 725, 732-34 (1993)); see also Fed. R. Crim. P.
52(b). Because the use of a transcript as a jury aid is within the
sound discretion of the trial judge, see United States v. Font-
Ramirez, 944 F.2d 42, 48 (1st Cir. 1991), DeLeon must show that the
judge's discretionary decision was "an error." He struggles
unsuccessfully to meet even this first requirement.
 On appeal, he argues that the district court's decision
to provide the jury with an unauthenticated transcript and
translation was erroneous per se. This court has acknowledged the
importance of ensuring that a transcript offered for use as a jury
aid be authenticated "by testimony as to how they were prepared,
the sources used, and the qualifications of the person who prepared
them." United States v. Carbone, 798 F.2d 21, 26 (1st Cir. 1986);
see also United States v. Rengifo, 789 F.2d 975, 983 (1st Cir.
1986). It is, unfortunately, clear that the transcript at issue
here was not subjected to this procedure. It is equally clear,
however, that DeLeon expressed no concern about this fact when the
transcript was first introduced. And while we have urged district
courts to obtain a stipulated transcript or to rule on the
admissibility of a transcript before the start of trial, that
suggestion "presupposes a timely objection to a transcript by one
of the parties." Font-Ramirez, 944 F.2d at 48 (emphasis added). 
We will not require trial judges to screen transcripts and to make
objections where the parties themselves have raised none; we leave
such legal advocacy to counsel. See United States v. Mazza, 792
F.2d 1210, 1226 (1st Cir. 1986) (rejecting an absolute rule that
would require trial judges to review transcripts whenever the
parties fail to stipulate to their accuracy).
 DeLeon provided no alternative transcript for the jury's
benefit, nor did he object to the use of the transcript at trial,
although he argued that there was a material inaccuracy in the
transcript (a contention that he barely mentions in his brief to
this court). Under these circumstances, we hold that the district
court's decision to allow the use of the transcript, without
sending it into the jury room, was well within its discretion and
was not error, much less plain error. See Ademaj, 170 F.3d at 65
(finding no abuse of discretion in the trial judge's decision to
permit the use of the government's duly authenticated transcript
during jury deliberations where defendant objected to its use at
trial, but raised no specific objections to its accuracy and did
not offer an alternative transcript); Pion, 25 F.3d at 21, 26-27
(noting the defendant's failure to offer an alternative
transcript); Carbone, 798 F.2d at 26 (emphasizing that the
defendant made no specific objections during the course of the
trial to the English translation transcripts); cf. Rengifo, 789
F.2d at 983 (finding no abuse of discretion in sending duly
authenticated transcript into jury room where the defendant
provided no alternative transcript).
C. Ex Parte Interview During Jury Tampering Investigation
 In December 1996, nineteen months after DeLeon's
conviction, the government sought the district court's permission
to interview two of the jurors in order to further its
investigation into allegations of jury tampering during the trial. 
The allegations pertained to co-defendant David Scialo, who was
acquitted of all charges. The court allowed the government to
conduct the interviews, which were transcribed for the record. At
the beginning of each interview, the court noted for the record
that it had not yet notified defense counsel of the proceedings in
order to avoid compromising the government's investigation. After
the interviews were completed, the court sent transcripts of the
interviews to defense counsel.
 DeLeon finds two faults with the district court's method. 
First, he says that the district court's failure to invite defense
counsel to the interviews constituted an abuse of discretion. 
Second, he argues that the district court's inquiry during that
"hearing" was inadequate. Because DeLeon has lodged his first
protest regarding this procedure with this court, rather than with
the district court, he has waived his objections and we review the
district court's actions for plain error. See Pion, 25 F.3d at 21.
 DeLeon has not established that the district court's
method was plainly erroneous or even an abuse of discretion. See
Roberts, 119 F.3d at 1014 (describing the "plain error" standard). 
"When a colorable claim of jury misconduct surfaces, the district
court has broad discretion to determine the type of investigation
which must be mounted." Boylan, 898 F.2d at 258; see also United
States v. Ortiz-Arrigoitia, 996 F.2d 436, 442 (1st Cir. 1993). The
trial judge's "primary obligation is to fashion a responsible
procedure for ascertaining whether misconduct actually occurred and
if so, whether it was prejudicial." Boylan, 898 F.2d at 258
(emphasis added). DeLeon argues that the procedure constituted an
abuse of discretion because defense counsel was not invited to the
interviews. He relies on Remmer v. United States, 347 U.S. 227
(1954), in which the Supreme Court held that "[t]he trial court
should not decide and take final action ex parte on information
[such as the offering of a bribe to a juror], but should determine
the circumstances . . . in a hearing with all interested parties
permitted to participate." Id. at 229-30.
 We have consistently reaffirmed that a model inquiry into
jury tampering allegations should include the presence of all
counsel or prior consultation with counsel in order to allow
counsel to help guide the questioning. See, e.g., United States v.
Cruz, 156 F.3d 22, 28 (1st Cir. 1998), cert. denied, 119 S. Ct.
1781 (1999); United States v. Hunnewell, 891 F.2d 955, 961 (1st
Cir. 1989); Tavares v. Holbrook, 779 F.2d 1, 2-3 (1st Cir. 1985). 
But we have also recognized that "[t]he trial judge is not . . .
shackled to a rigid and unyielding set [of] rules and procedures
that compel any particular form or scope of inquiry." Ortiz-
Arrigoitia, 996 F.2d at 442. This rule is both necessary and
sensible "[i]n light of the infinite variety of situations in which
juror misconduct might be discerned and the need to protect jurors
and the jury process from undue imposition." Id. at 443; see also
Boylan, 898 F.2d at 258.
 The first condition necessary to trigger a hearing is the
existence of a non-frivolous claim of jury tampering. See Boylan,
898 F.2d at 258. The trial judge in this case, finding himself in
a difficult position, erected a framework to determine whether this
threshold requirement had been met. The judge's procedure allowed
the government to examine the validity of the allegations
(allegations which, of course, had to be pursued), maintained the
integrity of the government's investigation, provided prompt notice
of the inquiry and its substance to defense counsel, and protected
the jury process from undue imposition. This was not a full-blown
hearing to assess the potential prejudice on the jury; this was a
preliminary inquiry that revealed that there was, in fact, no
colorable claim.
 To accept DeLeon's argument that the district court
abused its discretion here would mean that an ex parte interview
during such a preliminary inquiry necessarily constitutes an abuse
of discretion. Our decision in Mahoney v. Vondergritt, 938 F.2d
1490 (1st Cir. 1991), suggests otherwise. "Eleven days after a
Massachusetts jury found Matthew Mahoney guilty of manslaughter, a
juror sent the judge a letter suggesting that other jurors may not
have confined their deliberations to the evidence presented at
trial." Mahoney, 938 F.2d at 1491. The judge sent a copy of the
letter to counsel for both sides and agreed to interview the juror,
but rejected defense counsel's request to attend the interview. 
See id. After interviewing the juror, the judge "found beyond a
reasonable doubt that no extraneous prejudicial information or
improper actions occurred during the deliberations." Id. The
defendant then filed a writ of habeas corpus claiming that the
court had violated his Sixth Amendment right to counsel by refusing
to allow his lawyer to be present at the juror interview. See id.
 We held that the juror's "unfocused, unsworn assertions
demanded no more than the preliminary inquiry that the judge agreed
to conduct." Id. at 1492. "The judge was responsible for
shielding the jury's deliberative process from unnecessary
scrutiny, and his decision to conduct a private inquiry to
determine if there was anything justifying further intrusion fell
well within his discretion." Id. (citing United States v. Calbas,
821 F.2d 887, 896 (1st Cir. 1987) ("The court wisely refrained from
allowing the inquiry to become an adversarial evidentiary hearing,
so as to minimize intrusion on the jury's deliberations.")); see
also United States v. Beeler, 648 F.2d 1103, 1103 (6th Cir. 1981)
(per curiam) (upholding district court's refusal to allow counsel
to inspect post-trial letter from juror to judge); United States
v. Parker, 549 F.2d 998, 1000 (5th Cir. 1977) (finding no abuse of
discretion where district court conducted "an investigation in
which only the judge interrogated those concerned").
 DeLeon's reliance on Remmer does not help him. As we
explained in Mahoney, Remmer "involved a specific claim of juror
bribery that obviously warranted [a] thorough investigation." 
Mahoney, 938 F.2d at 1492-93. In Mahoney, the judge was faced with
vague and impressionistic concerns about impropriety, see id. at
1491-93; in the case at hand, the judge was faced with feeble and
unsubstantiated allegations of tampering. We think the same
concerns of unreliability pervade both situations, and so in this
case, "a Remmer-like hearing would have been premature." Id. at
1493.
 The district court's method of investigation was a
practical and common sense solution to a difficult problem. We do
not retreat, of course, from our customary insistence that district
courts involve all interested parties in a jury tampering or
misconduct hearing. But the juror interviews here constituted a
preliminary inquiry, not a "Remmer-like" hearing, and involved the
unusual circumstance where the continued integrity of that inquiry
was the sole reason for the exclusion of defense counsel. Under
these circumstances, we find that the court's actions were well
within its discretion and were not plainly erroneous.
 DeLeon has also failed to demonstrate how this procedure
substantially and adversely affected his rights. See Roberts, 119
F.3d at 1014. The government's inquiry did not involve DeLeon; it
involved his co-defendant, Scialo, who was acquitted. DeLeon does
not explain, and it is hard to imagine, how the government's
inquiry could have adversely affected him (given that he was
convicted and the tampering allegations involved threats designed
to induce an acquittal). See United States v. Doherty, 867 F.2d
47, 71-72 (1st Cir. 1989) (holding that judge's ex parte
conversation with, and excusal of, a juror who was in the middle of
a crisis did not require a retrial even though judge acknowledged
that the unilateral nature of his decision was wrong, because the
decision did not substantially prejudice the appellants).
D. Resentencing
 DeLeon's final argument is that on resentencing (after
his original sentence was vacated because his counsel had failed to
appeal) the district court incorrectly believed that DeLeon's
status as a deportable alien was not a valid basis for a downward
departure. DeLeon asks us to vacate his sentence and remand for
resentencing.
 It is well settled that "no appeal lies from a
discretionary refusal to depart" from the Sentencing Guidelines. 
United States v. Morrison, 46 F.3d 127, 130 (1st Cir. 1995). 
Appellate jurisdiction does attach, however, "where the record
indicates that the trial court's failure to depart was the product
of a mistake of law." United States v. Grandmaison, 77 F.3d 555,
560 (1st Cir. 1996). "When determining whether the sentencing
court merely refused to exercise its discretionary power to depart,
we consider the totality of the record and the sentencing court's
actions as reflected therein." Morrison, 46 F.3d at 130. "We do
not consider any single statement in a vacuum." Id. at 131.
 The trial judge believed that a defendant's status as a
deportable alien could not constitute a basis for a downward
departure. We have not yet decided that question, and we need not
do so now. The trial judge also explained that even if he did have
the power to depart, he could not find facts sufficient to justify
such a departure. This finding is clearly a discretionary refusal
to depart. Such an alternative finding suffices to support the
sentence and deprives this court of jurisdiction to review it. 
See United States v. Williams, 898 F.2d 1400, 1403 (9th Cir. 1990);
cf. Grandmaison, 77 F.3d at 565 (noting that ambiguity in a trial
judge's statements, without more, is not enough to make the
district court's refusal to depart appealable). Because the trial
judge indicated his refusal to depart even if he had the authority,
we have no jurisdiction to review his sentence. See United States
v. Romolo, 937 F.2d 20, 22 (1st Cir. 1991).
 The judgments of conviction and sentence are affirmed.