NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————————

No. 13-4595

————————————

UNITED STATES OF AMERICA

v.

JEAN A. SERAPHIN,

Appellant

————————————

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Criminal Action No. 2-10-cr-00229-004)
District Judge: Honorable Maurice B. Cohill, Jr.

————————————

Submitted Under Third Circuit LAR 34.1(a)
January 12, 2015

Before: AMBRO, FUENTES, and ROTH, <u>Circuit Judges</u>

(Opinion filed January 29, 2015)

————————————

OPINION[*]

————————————

AMBRO, <u>Circuit Judge</u>

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

On March 3, 2010, Appellant Jean A. Seraphin as well as Brent Hercules Antoine, Richard G. Foster and Ramar Gardiner went on a shopping spree in Southwestern Pennsylvania. In all, they visited five Walmarts, nine Giant Eagle grocery stores, and two GetGo convenience stores. The group's principal aim was to obtain merchandise worth thousands of dollars using fraudulently procured credit cards.

The group's "carding" scheme was going along without a hitch until they reached the Walmart in Bethel Park. At that location, both Foster and Antoine separately tried to purchase several gift cards and electronics. Both attempts were unsuccessful. Foster, for his part, looked to purchase a $1,500 Walmart gift card, but all of the credit cards he submitted for payment were declined. Then Antoine, in another part of the store, offered seven different credit cards to purchase two iPods and two laptops. But the cashier cancelled the transaction because the signature on the seventh card appeared suspect. After the pair left, a cashier alerted area Walmarts of the suspicious transactions.

Within the hour, the group arrived at their next stop: a Walmart just down the road in Carnegie. Foster again attempted to purchase Walmart gift cards with a fraudulent credit card. And while this time the transaction was approved, he unexplainably changed his mind about the purchase and left the store. Close in time and true to form, another (but this time unidentified) man tried to purchase iPods and a notebook computer in a different part of the store. But none of the six cards he used went through. He declined the cashier's invitation to speak to management or call his credit card company and instead left. According to several eyewitnesses, he appeared nervous.

Sensing that a carding scheme was ongoing, the loss-prevention employee at the Carnegie Walmart called local law enforcement and recorded the license tag of the minivan Foster got into. Officers arrived just in time to stop the group before they made their way out of the parking lot. Inside the minivan officers found four males (Antoine, Foster, Gardiner and Seraphin). Officers also noticed a safe in the back row, located between the captain seats in which Antoine and Seraphin were seated. Because none of the men were listed as authorized drivers in the rental agreement for the minivan, officers decided to impound the rental and instructed the group to remove any personal belongings. Notably, no one claimed ownership of the safe.

Officers secured a warrant to search the locked safe. Inside, they found eleven plastic bags, each of which contained gift cards and receipts. The gift cards had all been purchased on the same day (March 3, 2010) and were grouped according to the store in which each card was bought. Also present were 39 credit cards. The credit cards were in the name of either Brandon Anderson or Sean Francis—neither of whom had a connection to any member of the group—and had been used to purchase the gift cards.

Approximately eight months later, on November 15, 2010, and in a seemingly unrelated incident, Seraphin, Gardiner and another individual, Mark Daniel, were involved in a border search near the Canada-New York border, on the Canadian side of the Peace Bridge. A federal agent learned that the search revealed brand new merchandise without receipts and that Daniel was in possession of five counterfeit credit cards. Among the products found inside were: (a) four iPod Touches in their original wrapping; (b) three iPads; (c) a printout listing the location of western New York

3

Walmarts; (d) 33 gift cards; (e) five X-box games; (e) two lap-top computers; (f) 10 cell phones; and (g) two counterfeit checks. The agent conducting the search also learned that Seraphin and Gardiner were the subject of a pending credit card investigation in Pittsburgh.

Seraphin and Antoine were ultimately charged with: (1) conspiracy to engage in access device fraud; (2) possession of 15 or more counterfeit or unauthorized access devices; and (3) three counts of aggravated identify theft. They were tried jointly and convicted on all counts. (Foster and Gardiner were charged with slightly different crimes and entered guilty pleas.) The District Court sentenced Seraphin to 36 months' imprisonment and a three-year term of supervised release.

Seraphin raises two arguments on appeal: that the District Court abused its discretion in allowing the Government to introduce evidence of the Peace Bridge incident; and that there was insufficient evidence at trial to convict him of the crimes for which he was charged.

Seraphin contends that evidence of the Peace Bridge incident had "no logical connection" to the crimes he was being tried for and was introduced only to paint him as a criminal. In support, he highlights a passage from the Government's closing argument where it stressed the unlikelihood that Seraphin could have found himself in two strikingly similar situations without engaging in any wrongdoing:

> Wow. How unique. Gardner [*sic*] is driving the car on the Peace Bridge in New York eight months after this happened in March 2010. November 2010, eight months later, we see Gardner [*sic*] and Seraphin together again in a car and what's in that car? Counterfeit checks, electronic merchandise, two laptop computers.

4

Wait a minute.  If he didn't have bad luck, he wouldn't have no luck at all.  What are the odds?  Now its not evidence - - well, we are not saying that [because] he was caught later on in Buffalo, he must have been doing it in Pittsburgh, but it is evidence for you to consider he intended to have a conspiracy eight months earlier with these guys.

Our analysis of Seraphin's argument unfolds in two steps.  Was evidence of the Peace Bridge incident admitted for a proper purpose under Federal Rule of Evidence 404(b)?  If it was, we assess whether its probative value was substantially outweighed by its prejudicial effect.

Under Rule 404(b), the Government can't offer evidence of a defendant's bad acts to impugn his character or suggest he has a penchant for committing certain crimes. *See* Fed. R. Evid. 404(b)(1).  The same evidence is, however, admissible if it is introduced to rebut the assertion that defendant's "association with criminal co-conspirators was wholly innocent" or that he was "'merely present' at the scene of criminal activity without guilty knowledge or intent." *United States v. Rodriguez*, 215 F.3d 110, 119 (1st Cir. 2000).

We are convinced that the evidence of the Peace Bridge incident belongs in the latter box, principally because it was introduced to give the jury a reason to view Seraphin's defense with more than a shade of skepticism and in turn "conclude that he was a knowing and intentional participant in the crimes charged in the indictment." *Id.* For similar reasons—and because of the circumstantial nature of the Government's case—its probative value was significant.

We highlight that the District Court's limiting instruction—given twice— mitigated any prejudice.  Both times, the Court admonished the jury to consider the

5

evidence only for the dual purpose of determining whether there was a relationship between Seraphin and Gardiner and whether he had the knowledge and intent to engage in the charged conspiracy. Against this background, the District Court did not abuse its discretion and properly admitted the evidence under Rule 404(b).

Seraphin's challenge to the sufficiency of the evidence is on even weaker footing. Regarding the conspiracy count, he contends that the Government didn't produce any evidence of actual guilt other than his presence in the van with the three other occupants. And, for the substantive counts, he contends that the evidence at trial wasn't enough to convince a rational trier of fact that he either produced, used or trafficked in counterfeit access devices or possessed those devices.

In reviewing a challenge to the sufficiency of the evidence, we "review the record in [a] light most favorable to the prosecution to determine whether any rational trier of fact could find proof of guilt[] beyond a reasonable doubt." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). In doing so, we are careful not to "usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *Id.* Stated another way, "[w]e must sustain the [jury's] verdict if there is substantial evidence, viewed in a light most favorable to the government, to uphold the jury's decision[.]" *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003) (citation omitted).

Ample evidence supported all of Seraphin's convictions. As to the conspiracy count, while it is true that mere presence isn't enough to support a finding of conspiracy, the evidence at trial painted a much richer picture of Seraphin's involvement. He and the

6

other three occupants all hailed from the metropolitan New York area. They were found in a minivan with no luggage or other belongings to suggest that they planned to be in the Pittsburgh area for longer than it took to pay a visit to each of the stores they visited on a single day. There was also no evidence to suggest that Seraphin joined the group midstream or that his presence in the minivan on March 3 was purely by chance. This is especially true in the light of the Peace Bridge incident months later. Thus, as the Government argues, a rational juror could conclude that Seraphin's presence in the minivan was "deliberate, purposeful, and not the result of simply being in the wrong van on the wrong date and in the company of the wrong type of people."

The same reasoning applies to the substantive counts.

\* \* \* \* \*

For these reasons, we affirm.

7